Please be seated. Your Honor, the second case in the morning is C-10-0-8-8-0, John Doe M.D. and John Doe O.D.S.C. v. Delnor Community Dane Health Systems at all. On behalf of the Appalachians, Mr. L.P. Kirkland, Jr. On behalf of the Appalachians, Mr. William Cunningham. Mr. Kirkland, you may proceed. May it please the Court, my name is Alfred Kirkland. I represent the plaintiffs in this case, appellants here, Dr. Doe and Dr. Doe S.C. I'll just refer to the plaintiffs as Dr. Doe. This appeal comes from the Kane County Circuit Court, the Honorable Robert Spence. We appeal from several orders of the trial court during the course of these proceedings to date. There is an August 5, 2010 order that granted summary judgment to the defendants on the remaining counts at that time, counts 2, 3, 4, 10, 11 and 12. And that same order denied a cross-motion for summary judgment presented on behalf of Dr. Doe, which sought declaratory relief, establishing that in the conduct of the peer review proceedings in this case, the bylaws had been violated, the bylaws of Delnor, and that actual unfairness had infected the proceedings to the detriment of Dr. Doe. If you did not make that allegation of actual unfairness, we really wouldn't have much to contemplate, would we? Because the hospital acts and pretty much suggests that we don't need to get involved in professional decisions of this nature, correct? I would respectfully disagree, Your Honor. I believe that the law embodied in the Adkins case, which is the latest law on the subject, is that if the bylaws are violated, then the rule of non-review does not apply, and there is judicial review of the peer review proceedings. And how are we reviewing it? What are we looking for? Are we de novo? Are we manifest way to abuse of discretion? What are we looking for? I believe the burden on us is to show by the preponderance of the evidence that the bylaws were violated. In this case, I don't think that's even a close question. I would respectfully suggest that it is clear that the bylaws were violated in several respects. The first begins at the beginning of the case. The first is the failure to tell Dr. Doe, as required by the bylaws and by the Hospital Licensing Act, which is incorporated in the bylaws, all the reasons why the adverse action against him was taken. Is there any question from Dr. Doe that the bylaws are not consistent with the Hospital Licensing Act? Well, what the bylaws provide is that the Hospital Licensing Act is incorporated into the bylaws, and if there is any conflict between the two, the Hospital Licensing Act prevails. The Hospital Licensing Act uses slightly different language. The Hospital Licensing Act says all the reasons. It makes it clear that when the adverse action is taken, all the reasons that underlie the adverse action have to be disclosed. So that becomes the charge of the bylaws, because the way the bylaws are constructed, the burden is on the hospital when they apply the bylaws to marry them against the Hospital Licensing Act to make sure that there is not a conflict, and if there is, to follow the Hospital Licensing Act. So are you saying that there was another reason other than the one disclosed to Dr. Doe, which was the basis of the Board of Directors' decision to terminate him? Yes. That being the past history of problems with patient care? That was the second reason. But isn't it a fact that that really just surfaced in the closing brief that the hospital prepared for the fair hearing panel, and didn't they confine that to impeachment only? No. That is, in fact, I think, I would respectfully suggest, not actually correct. The document that you need to look at, I would suggest, is the minutes of the January 4, 2002, Medical Staff Executive Committee meeting. That meeting was held June 4, 2002. It was the beginning. It was the basis for the adverse action. That's what Dr. Doe should have been told was a part of the reason for the adverse action that was taken. And if you look at those minutes, they begin with an unidentified person at the meeting, and this is the very beginning. This is when the adverse action is taken. It says, in addition, it was reported that Dr. Doe has been reviewed on numerous cases by the Surgery PCE Committee, as he has a history of problems with care of patients. Then, going to the last page, what happens is there's a discussion, which includes that comment. Then Dr. Doe is invited in to talk. Then Attorney Brewer is invited in to address the group on where we go from here. So they've had the discussion about the facts. They've had Dr. Doe in and talk to Dr. Doe. After Ms. Brewer gets in, the question is raised whether or not discussion ensued. I'm quoting from these minutes again. The discussion ensued regarding what additional information would be needed and if other incidents could be brought into this investigation. So they've talked about the incidents in January of 2002, and now the question is, can we bring in other incidents? Ms. Brewer reported that in making a recommendation, this committee will need to inform Dr. Doe of all events. She is telling them, you are obligated, if you take into account other things than January 22, or excuse me, 25, 26, you have to tell Dr. Doe you're going to do that. The very next sentence is, it was then suggested that we find out everything that has happened over time, and if they are the same type of incidents. Then there's a report. Somebody has the listing of the past events, because the very next sentence is, in response it was reported that over the past years there had been some surgical judgments in question. However, they were investigated more than five or six years ago. He's had other cases evaluated by the Surgery PCE Committee, and currently there is another case being evaluated. But currently he has no other cases being investigated by the PCE Committee for failure to respond for consultation. So they're discussing now, in the context of looking at what to do about this January 25, 26, let's look at his past record. But they specifically distinguish it there, that there are no other cases about patient consultation. They do say that, and then after that, the discussion continued regarding the need to make a recommendation and what type of action to take. It was reiterated that the Surgery PCE Committee felt this incident was an extremely bad problem and warranted more than a slap on the wrist or another proctoring of cases, as this was a complete denial of responsibility. So now they're saying the PCE is telling us that this is serious because of these prior incidents, and they're saying that he was proctored before. Well, I see another proctoring implicating that he was proctored before, but I don't see the fact, in what you just read, I don't see that they're considering this particular incident serious because of other incidents. How are you reading that into that? Well, to me, at least, it's clear that what they are saying is the Surgery PCE Committee felt the incidents was a bad problem and warranted more than a slap on the wrist. In other words, warranted an enhanced penalty, so it's more than a slap on the wrist or another proctoring of cases, as this was complete denial of responsibility. So what they're talking about when they're talking about the PCE is PCE is saying there's been a proctoring, so you've got to start with something heavier than a proctoring. So clearly, the past events are part of the reasoning on how you get to a termination of Dr. Doe's privileges. If you go back to the start, it started out with the Review Committee, and the Review Committee recommended termination. They forwarded that recommendation to the Board of Directors. You allege that they erred and referred it also to the Executive Committee, but they referred it to the Executive Committee, and the Executive Committee concurred in the Review Committees. And then it went to the Board of Directors. The Board of Directors ordered termination. Then, again, we're looking at the fair review hearing as an appeal process. And theoretically, if you look at it literally and legally, it's an appeal process. It's a review of what went on before the hearing, the so-called trial, the Executive Committee and the Hearing Committee. The bottom line is the decision of the Board of Directors. And arguably, no details regarding the 18 other incidents of patient problems were given. And the plaintiff is taking the position that because they indicated that there was proctoring involved in the other 18, the plaintiff takes the position that because of that proctoring misinformation, it somehow affected the end result. Now, the Fair Review Committee, in opposition to the Board of Directors' decision, recommended 29 days of termination and then proctoring and then additional education, which is quite a lesser penalty, I think. It's quite a lesser penalty than termination. I'm not too sure. In the doctor reputation and finding jobs in other hospitals, what the difference would be between termination and the decision of the other board. But my question is, how do we know that the Board of Directors even considered what you allege is error, procedural error? And what degree of procedural error do you need to get to the point where there's, I assume, a vexed due process or a fair hearing, which is going to have some of the 15 minutes? Yes. Well, let me suggest what I think would have happened if they had followed the bylaws on the very first point. That is, tell Dr. Doe all the reasons. So the reasons Dr. Doe would have gotten is not just January 25, 26, but January 25, 26, plus your quality review file. You've got this in context. And, indeed, Attorney Brewer, later in the case, admitted that, in fact, that was their line of reasoning. They were taking in both. If Dr. Doe had been told that that was an issue in the beginning, then he, of course, would have reviewed the papers. So he would have understood what they were talking about. So then, when it got to the hearing before the fair hearing panel, at that point, when Dr. Persick started asking him questions about what had happened in the past, he, of course, would have reviewed what had happened in the past, and he could respond to Dr. Persick as to what his question was and whatever detail Dr. Persick wanted. He didn't ask for detail, though. He asked, have there been? Well, he did, and he did ask, have there been? And, if I could, I'd just like to go to the testimony, because it seems clear to me. The first question was, so, Ed Delmore, husband, you've never had any issues with regard to patient care on your record here in 20 years. So the question is, is there anything on your record? He responds, I went in and asked for my record. I got my record. There's nothing on my record. That's a straight question. The question is formulated in what's on your record. The answer is, I looked at my record. It's not there. All right. What's a record? I beg your pardon? What's a record? Are we using a technical term within this procedure, or are we talking about this global record? I think what they're talking about, and I believe it's clear from the context, is that there is a quality review file kept on doctors. I believe there's one kept on every doctor. It's a requirement that there be a quality review ongoing as to the doctor's performance. So your quality reviews that suggest issues of malfeasance or improper practice, that's your record of, you know, whether you've had problems in the past. So that is what I believe they're talking about, and I don't believe it's ambiguous. That's, I think, what they're suggesting. Mr. Person comes back and says, just use your recollection. I don't care what the record shows. Have you ever had any? And Dr. Doe interrupts him and says, there was a question about the amount of anesthesia. So now he's telling him about one instance where his, what he was doing was questioned, and what happened. But counsel, excuse me, you had the opportunity to reopen the hearing and present additional evidence and chose, your client chose not to do that, and rather just to submit another brief. So, I mean, given the fact that additional information could have been brought out by Dr. Doe and his counsel, the objection now is what? Well, the objection is we're on appeal. There's a fair hearing process that starts with a hearing. But I'm talking about even with the fair hearing panel. That's the appeal at the hospital level. What I'm suggesting, Your Honor, is that you're entitled to have all the charges processed through this orderly series of steps. Here we are 17 months after this has started. We've had two hearings. All the evidence is closed, and essentially it's being suggested, hey, why don't we just take up your entire past? One second. Your time is up, but I'm going to give you another five minutes. When you set the timer for five minutes, then when you hear it, if you could hear it. I have trouble, so you're much younger than I am. Five minutes more. Okay, so let's see. I've forgotten where I was. I was asking about why, with the opportunity to reopen and bring his side of the story out regarding the past history. That was not done. No, it wasn't done, but I would just suggest, Your Honor, that I don't think the bylaws contemplate that the hospital, the prosecution, so to speak, can dump in whatever they want to dump in at the end. As long as you, whatever you do, you do it at your own risk here, and you're liable to waive your right to have an orderly proceeding, because remember, we're talking about something they knew about back at the beginning. In fact, something that Attorney Brewer had said back in the beginning, you've got to tell them about this. They didn't tell them. So, I mean, I understand the factual situation, that 17 months later, somebody finally goes, oh, and incidentally, the 400 pages of material doesn't arrive in anybody's hands until, what, 10 days or so before the fair hearing panel issues their report. But at that point, it's being suggested, well, how would you like to start over? I guess I think the law allows somebody to reach a point of exhaustion. I mean, again, I understand the point that he was offered that he could choose different ways to handle this. In my humble opinion, there was no way that would be effective to handle this at that point. The whole proceeding had basically been trashed. But he didn't reach a point of exhaustion because you're here. You were in the trial court and you're here. He wants to go back, so he wasn't exhausted. Absolutely. And he chose to submit something in writing, and he did that. In other words, they gave him a choice of how to do it. He chose one of the ways to do it. And he requested the fair hearing panel as well after he made that request. I mean, he's going to make that request, but it certainly wasn't the hospital's request. That's right. Sure. Exactly. I'm not sure exactly where you'd like me to pick up, but let me say that I believe that it's clear that the bylaws were not followed and that all the reasons weren't given. But beyond that, as you get into the process then of the fair hearing procedures, you have lawyers from Gardner, Cartman, and Douglas who are – it's not unlawful that they have differing – these differing responsibilities, even though we may feel, some may feel that you're asking for trouble. But here, trouble comes up. I mean, first of all, his testimony, the testimony we were just talking about, was just baldly mischaracterized. I mean, it's not even close. They keep saying his position, he testified for the record that his standards had never been questioned. We just looked at that testimony. Well, he was asked another question. But he was asked another question after that, was he not? He was. And wasn't the question something like outside of the record? Were you – was your patient care ever questioned? I'm sorry, Your Honor, I lost my little marker here. I want very much to go to – Well, I'm doing it from recollection of what was in the pipes. But I want very much to be exact because – So there was another more open-ended question asked of him, and I believe he answered no or something to that effect. Here's what happened. I've got it now. So the question is, use your memory. So he says, okay, I'm going to use my memory. Now, I remember a time when there was a question about anesthesia, and I testified and blah, and nothing was done. So I think to anybody in that position, there was a challenge, there was a hearing, it's over, there was no patient problem, there was no problem. There was a review. You respond. Everything's okay. Then the question – and there's never been any problem with patient care. He says, not to my knowledge. I don't think anywhere in this record you're going to find evidence of a problem with patient care. That is, some place where a patient has been – suffered some detriment because of anything that Dr. Doe did. They're not asking here whether there's ever been any other questions asked about – Actually, the word problem is so ambiguous, it's hard to really put a stamp and say it means injury or just a satisfaction for the personal problem. So – That's exactly right. And, of course, when you're accusing somebody of being a perjurer and a liar in this context, you're supposed to be careful. We have to try to be precise. It's not – problems just can't be equated with issues and whatever you like. You can just say anything, and it is my position, and maybe counsel for the hospital will explain this. It's my position. There's nowhere in this record that Dr. Doe ever said his standards of care have never been questioned. That is just purely made up. So you're saying he just answered the question that was asked? And it's not even close. And the odd thing is that – I believe it was Mr. Persick, about ten days before the FHP released their report, wrote a note and asked two things. And one of the things was, A, has he been proctored or hasn't he been proctored? To which the answer is, no. You know, we've said it 10 or 15 times, but no, he wasn't. And then the other one was, could I have a transcript? Well, if you're accusing a man about lying by characterizing what's in the transcript wrong, and at least one of the members of the panel doesn't have a transcript, there's something wrong with that. So all we're saying here is that it's an accumulation of things that here, the fair hearing process just went totally off the rails. And if there is any meaning at all to the word fair in fair hearing process, what the bylaws contemplate, this is not it. And the board of directors had four reasons for terminating his privileges, and one of them was that he was a liar. And I say again, he was falsely accused of being a liar. There is no way I challenge anybody to show me in this record where Dr. Doe lied about anything, and yet that was one of four grounds on which his hospital privileges were terminated. Time is up. If you feel you've completed the answer to the question, we'll move to the other side. And you also have, Mr. Cunningham, an additional five minutes. Thank you, Mr. Chairman. Please, the court, on behalf of Delmar Community Hospital and the individual defendants, there's a lot of material to review in this case, but I believe that we wouldn't be here today if Dr. Doe had come to any of the hearings, particularly the earlier ones, and said, you know what, you're right, I should have come in to see this child. I should have come in to see because he had a life-threatening condition, which ultimately Dr. Doe acknowledged. This child is my patient. This decision involved a surgical condition, and despite the fact that there were other medical care providers there, nurses, emergency room doctor, infectious disease doctor, a number of pediatricians, radiology films, ultimately the decision here was a surgical decision, and it needed the attention of a surgeon. And I didn't come in as early as I should have. I dropped the ball as far as that's concerned, but you know what, I'm telling you, this will never happen again. If that had happened at that point in time, we wouldn't be here nine and a half years later. Well, counsel, does that hospital have a pediatric anesthesiologist? This was a 20-month-old child, and this condition that the child allegedly had is a serious condition and takes a pretty great skill to operate on. Did the hospital have a pediatric anesthesiologist? The record doesn't speak to that, and I don't know the answer to that question. The record doesn't answer that. I think that's kind of a specialty, though I would tend to think would be at a university-type hospital. Exactly. So is that not perhaps the reason that this recommendation was made to transfer the child to a hospital that would have been able to take care of the child? I'm sure that's ultimately what happened. In fact, when the emergency room, ENT, was called and came in promptly and made the evaluation, that was the recommendation, because we're talking about an abscess that was in the throat. Correct. And a condition that certainly could be life-threatening, and it's a surgical condition. Right. He was told by at least the emergency room doctors who had seen the child that that was the diagnosis, correct? Absolutely. And so he had that diagnosis. He had that to work with, and if he had come in, I believe that we wouldn't be here right now. Well, I know you're saying if he had come in and been contrite or at least admitting. The question is, did he come in at all? Was he there? Did he know about these hearings? He never – you were talking about in the hospital, or were you talking about the hearings? The hearings. The hearings, obviously. He got notice to all the hearings. He was at all the hearings. And basically, part of the problem is he never showed this remorse, as it's referred to in the record, about what had happened. Instead, I think to this very day, believes that he didn't do anything wrong. Well, is that what is required by a physician, is to show remorse as opposed to best judgment as to whether or not a medical condition or surgical condition can be handled by a particular hospital? The reason that remorse is significant here, I think, is as follows. Is you've got a situation where every – the MEC, the MSRC, all these initial committees, the fair hearing panel, the board of directors, every one of them without doubt felt that he should have done – he should have come in, he should have done something. Everybody did. The only one who didn't was Dr. Doe. And so then, as far as the problem is in terms of trying to correct the situation, if you have somebody who doesn't believe that they did anything wrong and is not acknowledging that, is not saying, this will never happen again, then that's what leads to the ultimate determination. That's why they say, you know, proctoring isn't really going to solve this particular problem, because he didn't think he did anything wrong. And I think that is one of the main reasons why this happened. That's why this event happened. That's why he got terminated. This appeal is primarily an allegation that the hospital did not follow its rules. So I would spend some time on that issue, that particular issue, since that was the focus of the appellant's argument. As far as that particular situation is concerned, I think that that came up by the committee in discussing the case. And I don't know that Dr. Doe was there for that particular discussion at that point in time. What we do know is that, ultimately, by the time of the fair hearing panel, he had these notes. And, in fact, the way that this came up, the question came up, if you look in the record at page 2089, which is Dr. Doe's testimony, and you look at the minutes, which is in the record 1999, if you look at that, you can see that he is going through a process. He's going through, at the time of the fair hearing panel, he's going through these notes. Because just before, in the testimony on 2089, just before we get to the point of being asked about the question by Dr. Persak, he comments on, and it says I was contacted 10 to 12 minute times by phone. That's right on the first page of the minutes. So he's commenting on these minutes at that time. And he says 10 to 12 times by phone. And then he goes on to say that it's also incorrect about this being reviewed on numerous occasions. That's how the question then arises by Dr. Persak. And the question that is of significance in that regard is the question that is asked, well, just use your recollection. I don't care what the record shows. You never had any. And Dr. Doe says, I remember there was a question about the amount of anesthesia that was used on a local patient. The patient did well. There was no problem. But some nurses chart that came in, and I testified that sometimes there's spillage of anesthesia, and there was no, there wasn't any action taken. Dr. Persak, and there's never been any problems with patient care? And the answer is not to my knowledge. Now, despite the reference to what the attorneys did or whatever, if you look at the fair hearing panel, if you look at the board of directors letter and the minutes with regard to that, that's the very thing that they question about is the fact that it's the answer of not to my knowledge. Why? Because you have a situation where there were 42, 42 charts that were reviewed. There were 18 cases that were referred to risk management in that time period from July 95 to August 1996. That's almost 50% of the charts that were submitted, that there was, that were submitted to the risk management committee at that time. And proctoring was ordered. It turns out that he wasn't proctored, but the proctoring was ordered. So when you've got that situation, it seems to me that he's being less than forthright with regard to his past problems. Are you referring to the letter from the board of directors after the fair hearing panel recommendation, or was that in the fair hearing panel recommendation? Well, this was brought up at the fair hearing panel. The testimony that I just read from was in the fair hearing panel, and that led to then the discussion about the past. And it led to a determination by the fair hearing panel who was there. My question is, you mentioned two letters, and I just want to distinguish, specify which letters are you talking about? Letter from fair hearing panel to board of directors, or letter from board of directors to Dr. Doe? The letter he's referring to is the letter from the board of directors to Dr. Doe, which set forth the basis of the reasons. And that mentioned the 18 prior incidents. I don't know if that letter mentioned it, but it was mentioned at some point earlier in the record, and that was part of what he got the chance to respond to with regard to and filed when they gave him the option. Do you want to have a rehearing to discuss this further, or do you want to have a situation where you can submit a brief and he chose to submit a brief? So it all came out at that, in that junction. So I think that that is a large part of what's determined. In fact, at page 2131 of the fair hearing report, there's a section in that fair hearing report with a caption on top, and it says attitude. And so that was part of, part and parcel of the decision in this particular case. What do we do in a situation where we have somebody who doesn't recognize that they missed their responsibility here? Is that the kind of physician we want to have on staff, someone who won't respond when they should respond and feels that they didn't do anything wrong? The fair hearing board didn't terminate, or didn't recommend a termination. That's true. And so they thought, well, I mean, if that's part of their recommendation or that's part of their logic, then it's also logical that maybe we need some modification to be on staff. Was he ever given that opportunity? Well, what happens is that the fair hearing panel, when that reaches the board, the board then has the, according to the bylaws, has the option of modifying or of affirming or of making any change that they feel is necessary. And understand that the fair hearing panel is called because of the decision made by the board from the previous records that had gone on, the hearings that had gone on, that this was, that they should terminate them. So now it comes back to them, and at that juncture the bylaws say that they can adopt that, they can modify it, and they chose, and essentially what you've got is a situation where there was no new information that came out of the fair hearing panel, except perhaps for this issue of credibility. So the board is being asked to go back on what their decision was when there's really no new evidence here, there's really nothing that would be a reason to change the board's original decision. And the fair hearing panel, in fact, in their discussion where they talk about what should occur, they talk about the fact that there was a discussion between the members of the fair hearing board about whether or not a single event of termination should be awarded or given because of one event. And that's what led to their feeling about modification. And I think what that shows is that the fair hearing panel was looking at, the genesis of this was the January 2002 event, and that's the genesis of it, and that this other conduct was being used solely with regard to the credibility of Dr. Doe. So what you have is somebody who didn't come in when they should have, and all the panels agree to that. You've got somebody who, according to them, the attitude is not what they feel it should be, the remorse is not there, the feeling that there's a need to change, this will never happen again, and then you've got the credibility issues. So for all of those factors, the board has to make a determination as to whether or not this is somebody they want to have on their staff. They decided they didn't. And the only way that that can be challenged at this point in time, on the basis of the law, if you look at the Atkins case and the immunities that apply as far as that's concerned, is if there's some showing of some willful and wanton conduct as defined by the Lopez, and that's simply not evident anywhere in this record, that there was that type of conduct that was evident. Counsel, how do you respond to counsel's argument that Dr. Doe was never informed of all of the reasons that termination was considered? He referred initially to the minutes, which talked about Dr. Doe's past history of complaints, or at least of reporting to Quality Assurance. Well, I think that, and in fact, I thought as I was hearing the questions by Your Honors about that and looking, that the minutes were reviewed and that while counsel has his interpretation, I think that another interpretation is that from the wording of those minutes is that essentially what they felt was, well, this is conduct that we're looking at, but it was not the same type of issue that was involved here. That is, a failure to commit to this other kind of patient care, and it seemed to have been dismissed at that point in time. And then if you have a fair hearing panel in their bylaws, what it indicates is they have a broad power with regard to the fair hearing panel of being able to, it says the bylaws say at 228, the fair hearing panel shall rule against the member, Dr. Doe, unless Dr. Doe has proven the board's decision was arbitrary or unreasonable or contrary to the evidence. And the bylaws permit again at 229 of the record, section 12, subsection B, subsection small Rome numeral 7, they have the power to broaden the issue so the fair hearing panel has the ability to bring in more information. That's what it says in the bylaws. They state that the fair hearing panel does not need to be bound by the statement of the grounds that were originally brought. They can base their decision in whole or in part on issues not originally considered. That's part of their mission. It's part of what they're told in the bylaws they can do. And when you all come down to it, as far as the decision, ultimate decision makers on the board, once again, unless there's some showing on the part of Dr. Doe, which is totally absent here, that the board's decision was arbitrary or unreasonable, this can't be overturned. And the Atkins case talks about that. It's not the mission of courts to go in and substitute their judgment for the judgment of those who are on there and whose job it is to make sure that this hospital is run safely for its patients. And so I think that that's a major portion of what happened here. Atkins is of significance as far as the immunities are concerned. In fact, I think the immunities are huge in this particular case. And also what's important in this particular case is that they have to look and see. There's been a lot of time in their briefs and arguments talking about the fair hearing panel. But the ultimate decision here comes from the board of directors. And there's literally no evidence whatsoever that's been submitted or indicated that the board's decision makers were anything other than doing their job. In fact, there's a presumption, and the Atkins case talks about that, that the decision makers served with fairness and integrity in performing their peer review functions. And that has not been rebutted at any time in this record. There are some doctors who, maybe by sheer coincidence, are both on the board of directors and who were involved in this process. Yes. Isn't there some mechanism within the bylaws or the licensing act to prevent that from happening? I don't believe there's anything in any of the acts, either the federal act or the state act. And there's nothing in the bylaws that prohibits them from serving on the board. There's a misrepresentation, number one, about Dr. Riley, who was the original prosecutor, and his role as the board of directors. But if you look at the minutes and the findings that were made by the board of directors to that meeting, you'll see it lists all of those in attendance. And Dr. Riley is not there. He was not part of that decision making. He wasn't there in any way, shape, or form. And the other two were Dr. Buell, who's actually a plastic surgeon. So if there's a monetary change, apparently it might have something to do with procedures around the neck or something. But while he was there, there was no indication, there was no testimony that he did anything out of the ordinary. And he was told that he couldn't vote, and he didn't vote. And Dr. Duarte, who was the original emergency room doctor, was present. And when he was deposed, in his testimony, in fact, they cite to it, and he has no memory of what happened. No one has any memory of him offering any input at that point in time at all, any of those who were deposed who were on the board. And he did not vote. So it seems apparent that there's certainly no undue fairness in this entire situation. In fact, in terms of fairness, I think that what we can see is that they followed their bylaws. Notices were sent in all meetings to which there were hearings, or actually the initial one is not, it says specifically it's not a hearing, it's an informal meeting. But he received all those notices. He was given the right to appear, given the right to cross-examine witnesses, to bring in witnesses himself, the right to present witnesses. He was given the right to object. He objected to the process of what the attorneys were doing, and that was ruled upon because the bylaws indicate that the attorneys can do that. And there's specific reference we've made in our brief as to that. The points of credibility, he was given a chance to change his testimony. And that comes in the record as well, where he was offered, and this comes at page 2156 of the record. On that page it says, in that same request, the fair hearing panel asked the same question of Dr. Doe and also asked him whether he wished to change his testimony. And Dr. Doe's response to the fair hearing board request dated October 27, 2003, which is referred to as the Dr. Doe response, Dr. Doe did not change his testimony. So he was given that option. He was given the option to, once he got the material, to have another hearing and he chose to file a brief. And this all happened before the fair hearing panel made their decision and made their recommendation. And I should point out, of course, they gave a more favorable decision for him than the board did. But I've already covered the reasons why the board could make their determination and their rights under the bylaws to modify what the fair hearing panel came up with. I heard the speaker. Did that include the full 20 minutes? You could finish up. I will just say that in conclusion, Your Honors, that I've spent 30 years or more representing medical professionals. I believe many cases of harm to patients could have been avoided by the diligent use of the hospital's disciplinary process. I think what Del Norte did here was very appropriate in its bylaws and its approach to this case. I think that the decisions of Judge Spence from August 5, 2010, with a very extensive order, which I think is a good starting point in looking at this case, and the order of Judge Fabian of April 20, 2007, should be affirmed. And I thank you very much for your time. Mr. Poggle. Thank you, Your Honor. Dr. Reilly was present at the February 13, 2003 Board of Directors meeting. That was the first Board of Directors meeting that passed upon the recommendation of the Medical Staff Executive Committee after the Medical Staff Review Committee had done its work. So he wasn't at the second meeting, but I don't think we ever said that he was. With respect to the issue of bringing in new grounds, the bylaws do talk about bringing in new grounds. But what they require is, number one, that the new grounds bear some reasonable relation to the original grounds. There's no reasonable relationship between – we don't even know what they're talking about in terms of the historic conduct, because it was totally mischaracterized from the very beginning, talking about proctoring when there was no proctoring. But the point is that if you want to bring in something new, it has to be reasonably related to the charges that are currently pending. And the second is that you have to give the testimony to the other side. You have to show it to them, they have to be present and have a chance to deal with that new evidence. Dr. Hill was asked to change – whether he wanted to change his testimony. I really, frankly, can't figure out what he would change. Every question he was asked, he answered. So I don't know, really, what he could change. I would call the Court's attention, again, to what Attorney Brewer, who was the attorney who officiated at the June 4 meeting where this all started, and then was the attorney who was essentially the prosecuting attorney in the proceedings as they went along, what her argument was, after this closing brief was filed, and these two pieces of paper from this proceeding we don't know much about, but where there were some reviews of his charting and energetic criticisms, she said in her brief that a witness, Witness Nelson, had testified that in drafting fair hearing process of the bylaws in 1985, what she envisioned the adverse action process to be would be the culmination of a series of events that led to medical staff to conclude that the petitioner was below performance, below the level of acceptability. She responds in her argument, in her brief, that points out that the Surgery PCE Committee's review of Dr. Doe's involvement, this is back in June and May of 2002, in the care of the child issue, the committee considered in making its recommendation for termination of medical staff membership that Dr. Doe had a history of problems with care of patients. The MSEC, she is still arguing, discussed Dr. Doe's past history of case review and proctoring in making its own recommendation to terminate Dr. Doe's medical staff membership in this instance. This whole proceeding is based from the very beginning on incorrect information. The idea that Dr. Doe was proctored, that was present back in June and it was one of the things that the committee relied upon in going ahead to terminate his privileges and the best information we have is when someone from the fair hearing panel finally raised their hand and said, would somebody just give me a straight answer, was there proctoring? The answer was there was no proctoring. Now the issue here is simply whether Dr. Doe received a fair hearing process that complies with the bylaws and that was free of actual unfairness. I just, the misrepresentation of his testimony, I don't know how you get by that. You know, if I can convince any finder of fact or decider of any, an arbitrator or anybody that my opponent is a liar, it's over. It's, that's it. And that's essentially what happened here. Maybe we need to explain the terminology then so that I have a better, the question asked him was, was there ever any problem with patient care? Was that the question? I want to go and just be absolutely honest. Then what were the complaints about? What was the past history about? It wasn't about patient care? What were the complaints about then? What we know about, let me see if I can just, what's the definition of patient care? Is that a word of art? I don't believe it is. I guess I'm missing the point then. Why is it not an inaccurate statement that the doctor made? If there were 18 reports, what were the, how would you categorize the 18 reports during that period of time? What were they about? How would you describe them? They were about criticisms of his charting. Charting, right. So that, in other words, he would have written down an incorrect diagnosis. Is that right? I think in this instance it was felt that the charts were incomplete. So that he never finished charting about a particular patient? Is that it? There's nothing on this in the record. My understanding is that charting is a common problem. There are time limits to get your charts done. Correct. And usually then you can't operate if they're not, there are consequences for that. That's right. And also there are standards that are applied as to what is sufficient charting. I believe there's evidence in this record that at a point, his charts were actually found to begrudgingly fulfill the requirement. But there was energetic criticism at the time, which is one of the two pieces of paper that the fair hearing panel was given, about his charting, saying basically that it was very bad. So you're saying the 18 complaints were only about charting and not about how he administered care to the patients? Well, let's see. I guess, to be honest, I can't, I don't have enough information to know precisely what the 18 were. Because all the fair hearing panel was given is these two pieces of paper, not even complete documents, just two scraps of paper. And, I mean, I do think one very telling aspect of that is when Mr. Craig, who was the chief, you know, the head of the fair hearing panel, testified in his deposition, he was asked about this past patient care issue. Because his lawyer, or his panel's lawyer, so to speak, had told him they could go ahead and consider that. Not for impeachment, but in deciding the case. Nobody let Dr. Doe in on that. But that actually happened. There's testimony to that effect. Then he was asked about the effect of the past patient care. And with your indulgence, if I just read this, I think it does make a point. He says, when I reviewed my notes recently, I realized we made, I made the notation, that while there was a previous incident, and there was a previous recommendation made for rehabilitation of that incident, we didn't have the time to research it thoroughly enough to reopen that case, if you will. What we did have evidence, clear evidence of, is now, is a history that we had done that more than once. Did that play into the analysis, he says, in the discussion you had about, okay, what to do with respect to Dr. Doe at this time? And he says it played in in two respects, I believe. One was that he now shows a history of, it was more than one, just one circumstance. And the second one is that because that he lacked in credibility, and he meant credibility, because he lied about not having a previous incident. Of course, he didn't lie about not having a previous incident. He brought it up himself. He says, well, I recall, but we didn't have, as I said in my notes, we didn't have the time to investigate, to reinvestigate that case. We merely had, we merely knew that there was an incident. We knew that there was a penalty for a recommendation for the rehabilitation applied, and we knew that the rehabilitation wasn't followed. So we knew there was an incident prior to this one, but we didn't reopen the case or reinvestigate it. So, I mean, what he's saying is basically, you know, basically what he had is he did something else wrong. Some of you don't even really know what it is, but something happened earlier that was bad. That's about what, I mean, that just can't be a fair hearing. I mean, it just can't. It would be, Dr. Doe never had a chance on this, just because of those kinds of problems. And the very idea that they would give these folks two parts of documents and then ask them to find that Dr. Doe was a liar, based upon what the testimony is, is a travesty, I believe. Thank you very much. Thank you.